25-08013MB(JR)

# AFFIDAVIT

I, JOSUE RUIZ, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, an electronic Target Device described in Attachment A which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Task Force Officer (TFO) with Homeland Security Investigations (HSI) and have been since February 2025. Prior to becoming an HSI Task Force Officer, I was a Customs and Border Protection Officer for the Nogales Area of Responsibility. I have over six years of experience conducting criminal investigations into violations of local, state, and federal law including, drug trafficking, firearm trafficking, human trafficking, and currency smuggling.

3. As a TFO with HSI, I am responsible for investigating and enforcing violations of federal law, including those enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code. In preparing to become a TFO, I attended the several criminal investigator courses and the CBP Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.

4. As part of my current duties with HSI in Nogales, AZ, I have participated in criminal investigations involving drug trafficking organizations. Pursuant to my participation in these investigations, I have performed various tasks which include, but are not limited to: (a) functioning as a case agent, which entails the supervision of specific investigations involving the trafficking of narcotics; (b) functioning as a surveillance agent and thereby observing and recording movements of persons trafficking in drugs, illicit proceed and other activity in support of their illegal activities; (c) interviewing witnesses, suspects, cooperating individuals, and confidential sources relative to the illegal trafficking of drugs and illicit proceeds, and (d) participating in investigations involving the purchase of drugs.

5. Through my training and experience, as well as the training and experience of other law enforcement officers participating in this investigation, I know that drug-traffickers commonly use cellular telephones to communicate with their narcotics associates and to facilitate the commission of their narcotics offenses. These cellular telephones usually contain electronically stored data on or within the cellular telephones, including, but not limited to, contact names and numbers of narcotics associates, call details including call history, electronic mail (email) messages, text messages and/or text message history, and digital images of the drug-trafficking associates and/or activity, all of which can be used to identify and locate narcotics-trafficking associates, to identify methods of operation of the drug-trafficking organizations (DTOs), and to corroborate other evidence obtained during the course of the current investigation.

6. In the course of conducting drug investigations, I have personally interviewed informants and persons involved in the distribution of illegal drugs. I have consulted with other experienced investigators concerning the practices of drug-traffickers and the best methods of investigating them. In preparing this Affidavit, I have conferred with other Special Agents and law enforcement officers involved in this investigation. Furthermore, I have personal knowledge of the following facts or have learned them from the individuals mentioned herein.

7. Based upon my knowledge, training, and experience, as well as information related to me by law enforcement officers and others experienced in the forensic examination of electronic communication devices, I know that certain types of cellular telephones referred to as "smartphones" (such as the TARGET DEVICE) generally offer more advanced computing ability and internet connectivity than standard cellular telephones. Provided that internet access has been purchased through an electronic communication service provider for a particular smartphone, a smartphone is capable of running complete operating system software, has full access to the internet and/or electronic mail (including file attachments), is capable of text and instant messaging, can create and edit documents created with computer software, is capable of storing large amounts of data, and can be interfaced with desktop and laptop computers.

8. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

9. The property to be searched is a cellular telephone, IMEI unknown, hereafter referred to as the Target Device, which HSI agents seized from Georgina Elizabeth CRUZ-DIAZ's person on May 20, 2025, at the time of her arrest at the DeConcini Port of Entry in Nogales, Arizona (see Probable Cause section for details). The Target Device is currently in the custody of HSI Nogales agents at the HSI ASAC office in Nogales, Arizona, and is connected to a charging rack for preservation of evidence.

10. The applied-for warrant would authorize the forensic examination of the Target Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

11. On May 20, 2025, at approximately 8:30 p.m., Georgina Elizabeth CRUZ-Diaz attempted to enter the United States from the Republic of Mexico at the DeConcini Port of Entry in Nogales, Arizona. CRUZ-Diaz was a passenger in the front seat of a 2023 GMC Sierra bearing an Arizona license plate. An adult male passenger was in the backseat of the vehicle. During an inspection, a Customs and Border Protection canine, trained to detect the odor of narcotics, alerted to a trained odor emanating from the backseat of the vehicle. Officers searched the vehicle and found an orange bag containing nine packages of suspected narcotics on the backseat. Representative samples of the contents of the packages were field tested and yielded positive results for heroin and methamphetamine. One package contained heroin and weighed 475.4 grams. Eight packages contained methamphetamine and weighed 5.24 kilograms (11.55 pounds).

12. Officers found a bus ticket with CRUZ-Diaz's name in the orange bag.

13. While being processed for her arrest, CRUZ-Diaz told the arresting officer that she had been given a bag to take to Mesa, Arizona. When the arresting officer asked what bag she was referring to, CRUZ-Diaz responded by saying it was the orange bag.

14. CRUZ-Diaz declined consent to search her phone.

3

15. During a post-Miranda interview of RUBANOW, Joseph Serge, the driver and registered owner of the 2023 GMC Sierra in which CRUZ-Diaz was the front seat passenger; RUBANOW told HSI Task Force Officer (TFO) Josue Ruiz that he traveled from his home to Nogales, Sonora, Mexico with the purpose of giving CRUZ-Diaz a ride to Mesa, Arizona.

16. RUBANOW told TFO Ruiz that on the day prior, he dropped CRUZ-Diaz off at the bus station in Phoenix, Arizona, where she boarded a bus bound for Hermosillo, Sonora, Mexico, unsure of when she would return.

17. RUBANOW reported that on the day of the interview, CRUZ-Diaz contacted him in the morning, claiming that she was in the hospital and needed a ride back to Mesa, Arizona.

18. RUBANOW stated he arrived in Nogales and began attempting to contact CRUZ-Diaz but was unable to and that after waiting for 1 to 1.5 hours, CRUZ-Diaz arrived with her luggage and placed it in the backseat area of his vehicle.

19. RUBANOW stated that he noticed that CRUZ-Diaz was carrying her bag and backpack, believing that it was the same luggage that she departed to Mexico with on the day prior.

20. CRUZ-Diaz's cellular phone (Target Device) was found on her person and seized by agents.

21. On Wednesday June 11, 2025, RUBANOW, Joseph arrived at the Homeland Security Investigations (HSI) office in Rio Rico, Arizona to receive a cell phone that was being remitted to him by TFO Josue Ruiz. The cell phone had previously been seized as part of an investigation involving the narcotics seizure involving CRUZ Diaz

22. RUBANOW handed his phone (a new phone, not the phone which was seized from him) to TFO Ruiz and said "Go ahead and look through it. I am here to help in any way that I can". RUBANOW opened his text message app and showed TFO Ruiz a conversation with a contact saved under "Juan Taxie Driver" (hereinafter referred to as "Juan").

23. RUBANOW stated that on a day following his encounter with U.S. Customs and Border Protection, he received a phone call from an unknown male with an unknow Mexican phone number (+52 631 124 9508), who identified himself as a taxi driver in Nogales, Sonora, Mexico. Shortly after that phone call, he began to receive a series of text messages from the contact, "Juan".

24. Upon reviewing the text message conversation between RUBANOW and "Juan", TFO Ruiz noted the following text messages:

- "Juan" writes "Hey, I'm busy talking to Elizabeth (Agent notes: CRUZ Diaz's middle name) as soon as possible. She stole some things from me and I need her to deliver them because they want to hurt us". "hey can u send me the number of Elizabeths mom".
- RUBANOW inquires as to whether "Juan" is Elizabeth's friend in Spanish, and then responds, "And you drive a taxi?". "It sounds like maybe you took it and blame her". In the next message, RUBANOW translates the message to Spanish "Parece que tal vez lo tomaste y la culpaste a ella?"
- "Juan" writes "No es asi ella lo tomo" (It is not like that, she took it).
- "Juan" then writes "Solo necesito que ella regrese eso solamente" (I just need her to return that) and "Solo ocupo ella regrese eso solamente ella sabe que ahi lo tiene" (I just need her to return that, only she knows what's there).
- "Juan" later tells RUBANOW "I need to get in contact with her ASAP because we have a problem, especially her because she took it and she hasnt reported back to us" and "we already know you're not involved, but you were the last person with her when you came for her to Mexico in a white truck and after she stopped answering us and all we think now is that shes hiding from us with our stuff".

- RUBANOW responds "You have told me so many different stories now you're telling me she's a drug mule carrying drugs over the border… I don't believe.?"
- "Juan" responds "Check the orange bag she crossed with a blanket and you'll see yourself. We want our stuff back" (Agent notes: CBP found nine packages of narcotics inside of an orange bag during their inspection).
- Juan refers to the orange bag a second time writing "All we want is our stuff that she crossed over in an Orange bag".
- Later in the conversation RUBANOW writes "why did you have her do such a terrible thing. She's a young beautiful girl and you ruined her life."
- "Juan" responds to that message by writing "She decided to do that, no one forced her to take it away, she did it of her own free will".
- Later in the conversation RUBANOW writes "Call ice she's in jail you can't speak to her nobody can. You fucked up her life by putting drugs in her bag."
- "Juan" responds "Ella las tomo yo no se las puse ahi" (She took them, I didn't put them there).
- RUBANOW then writes "You're a taxi driver, correct? You must have connections to bring drugs across the border by sneaking them in somebody's bag. I don't know. All I know is I can't believe she would do such a thing. How do you know Elizabeth?"
- "Juan" finishes the text message conversation by writing "She decided to take them and take them away".

25.  Based on the above, I believe there is probable cause to search the Target Device for evidence related to narcotics trafficking. As mentioned above, narcotic trafficking organizations will communicate via cellphones to receive updates on the

delivery of contraband. Additionally, based on my training and experience, CRUZ-Diaz's border crossing history suggests possible involvement in narcotics trafficking. Border crossing records show that on the day prior to the incident, CRUZ-Diaz traveled to Mexico via a commercial bus. This mode of travel is not typical and impractical for international trips on consecutive days, given the significant distance between Mesa, Arizona and Hermosillo, Sonora, Mexico, estimated to be a six hour drive each way. Furthermore, according to border crossing records, CRUZ-Diaz would normally cross the U.S./Mexico border bi-weekly or monthly, indicating that her consecutive crossings may have been related to coordinating or retrieving narcotics from Mexico. In sum, a search of the Target Device could reveal information that would tend to identify those co-conspirators, reveal CRUZ-Diaz's role in the conspiracy, and potentially identify locations being used for drug smuggling.

26. The Target Device is currently in evidence storage at HSI's ASAC office in Nogales, Arizona. In my training and experience, I know that the Target Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Target Device first came into the possession of HSI.

## TECHNICAL TERMS

27. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of

capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking

directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that

computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28. Based on my training, experience, and research, I know that the Target Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

30. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Target Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

33.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Device described in Attachment A to seek the items described in Attachment B.

I swear, under penalty of perjury, that the foregoing is true and correct.

_____
Josue Ruiz, Task Force Officer
Homeland Security Investigations

Subscribed electronically and sworn to before me telephonically this <u>13th</u> day of June, 2025

_____
Jacqueline M. Rateau
United States Magistrate Judge

# ATTACHMENT A

## ITEMS TO BE SEARCHED

The property to be searched is as follows: cellular telephone, IMEI unknown, hereafter referred to as the TARGET DEVICE, which HSI agents seized from Georgina Elizabeth CRUZ Diaz's person on May 20, 2025, at the time of her arrest by U.S. Customs and Border Protection Officers. The TARGET DEVICE is currently in the custody of the HSI Nogales agents at the Nogales ASAC office and is connected to a charging rack for preservation of evidence.



# **ATTACHMENT B**

PARTICULAR THINGS TO BE SEIZED

1. All records on the Target Device, as described in Attachment A, that relate to violations of 18 U.S.C. § 841, including:

a. lists of customers and related identifying information;

b. types and amounts of narcotics or narcotics smuggling, as well as the location of the purchase and who made the purchase;

c. types, amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered as well as dates, places, exchange rates, and amounts of specific transactions;

d. any information related to sources of narcotics or money (including names, addresses, phone numbers, or any other identifying information) or the destination or individuals to whom the narcotics or money were to be delivered (including names, addresses, phone numbers, or any other identifying information);

e. all bank records, checks, credit card bills, account information, and other financial records;

f. GPS location data, including coordinates, stored on or accessed through the Target Device;

g. data indicating locations on maps stored on or accessed through the Target Device;

h. any information recording contact between CRUZ Diaz and any other co-conspirators;

i. electronic correspondence stored on or accessed through the Target Device relating to weapons smuggling, to include emails and attached files, text messages, and instant messaging logs.

2. Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through the Target Device.

3. Contact lists stored on or accessed through the Target Device, to include telephone and email contact names, telephone numbers, addresses, and email addresses, and internet access information.

4. Any images/photographs or videos;

5. Evidence of persons who used, owned, or controlled the Target Device, including logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, electronic correspondence, and telephone contact lists stored on or accessed through the Target Device.

6. Any evidence or records that may be recovered or restored, that were previously deleted from the Target Device.

7. Records evidencing the use of the Target Device to access the Internet, including:

a. records of internet protocol addresses used;

b. records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

14

8.      Any data/information stored on the Target Device subscriber identity module (SIM) card(s) or all other cards used in the storing of information in the wireless telephones, including any images/photographs or videos, telephone numbers, numbers called, numbers stored for speed dial, pager numbers, names and addresses, electronically stored text messages, calling card numbers, e-mail/internet access information, and/or identifying information.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

In some cases, the Target Device may be damaged beyond repair, password protected, or otherwise inoperable and less invasive data analysis techniques will not accomplish the forensic goals of the examination. In these cases, an analysis technique referred to as "chip-off" may be implemented to conduct the data extraction process. Chip-off is an advanced digital data extraction and analysis technique which involves physically removing flash memory chips from a subject device and then acquiring the raw data using specialized equipment. This process renders the wireless communication device unusable.